## E. B. DANIELS *v.* THE STATE.

1. PROSECUTIONS BY INFORMATION.—A county attorney himself made affidavit, on his "information and belief," of violence inflicted ·by appellant on his wife, and filed in the county court an information charging the accused with an aggravated assault upon a woman. *Held*, that such an affidavit, made by a county attorney, is not authorized by the act of 1876, which regulates prosecutions by informations; and, for want of a legal affidavit to serve as a basis for the information, the conviction is set aside and the cause dismissed.

2. SAME.—In such a case the county attorney should have availed himself of the means provided by the statute to obtain from his informant the necessary affidavit.

3. SAME.—If the county attorney were the only witness of· an offense presentable by information, it seems he might himself make the affidavit.

4. SAME.—See the opinion in this case for the statutory provisions respecting such affidavits, and the means for enforcing them from the proper party; and see *Davis* v. *The State, ante*, p. 184, for the relation of the affidavit to the information based upon it.

APPEAL from the County Court of Navarro. Tried below before the Hon. S. R. FROST, County Judge.

Appellant was convicted of simple assault, and fined $25. The opinion fully discloses all facts underlying the rulings made. Nevertheless, the counsel for the appellant make such a presentation of the *res gestæ* as reporters do not " willingly let die ; " and they also moot some very suggestive legal questions touching the statutory law of assaults as affected by the relation of husband and wife. A considerable portion of their argument is therefore given.

*Simkins & Simkins*, for the appellant. E. B. Daniels and Fanny lived together as man and wife for eleven years, in all the peace and happiness usually allotted to that condition of life. Poor and humble, they lived on their little farm, dependent on his exertions, which supported, not only themselves, but their six surviving children and the mother of Mrs. Daniels, ·whose earthly pos-

23

sessions were proven, on trial, to consist of two cows. All the witnesses state that defendant was, during those eleven years, a kind, faithful and attentive husband and, in fact, continued so until June, 1876, when a change began to come over the spirit of his dream.

Shortly before this time, a Dr. Wright moved into the neighborhood. The statement of facts but slightly discloses the character of this individual. He is one of those *raræ aves* sometimes met with in rural communities, with too much genius to be nobody and too little sense to be anybody. He combines the profitable callings of preacher and doctor, and, although a man of family, seems in either or both capacities to have been irresistible among the fair sex. A preacher, a strong class-leader, singing-master, Sunday school-teacher, doctor, and ready to give legal advice, and withal of a goodly countenance, the court may appreciate how hopeless, in the defendant's estimation, would be the contest between this wonderful man and himself—a short, ugly rustic—and how much reason the defendant had to fear the worst.

When he first came, defendant employed Dr. Wright twice, and very soon after declared he should, under no circumstances, give another pill in his family; and this was not because defendant's confidence in his medical skill was less, but because that confidence which was the result of eleven years married life seems to have been rudely shaken by the reverend doctor's ministrations. Wright's visits, after this, apparently ceased; yet, somehow, whisperings, not creditable to the fair fame of the dame, were heard, and rumor with her thousand tongues began to couple her name with the wrong Wright.

Defendant, painfully conscious of the danger, and unable to locate it, began to grow restive—began to behave unpleasantly—and hardly would let her sleep at night on account of his quarreling. And so matters stood, when the

proof came most unexpectedly. Wright presented him a bill for $38. Thirty-eight, divided by $2, the usual medical fee for the country visit, and the result shows that, between July and September, Dr. Wright was nineteen times in defendant's house as a physician, unknown to him ; and the record is silent as to the number of visits paid as a man of God.

That defendant went home under the influence of strong emotion, is unquestionable ; and it is also apparent that he determined to control his wife by making her fear him.

In all the acts proven against him the court will see how careful defendant was not to injure or inflict physical pain upon his wife. True, he mouthed, cursed, and ranted, and tied her hands and threw the rope over the joist, and displayed his knife and whip, but we respectfully call attention to Mrs. Finch's (the prosecutor's) testimony : "They were quarreling about the doctor's bill, and his wife told him to let her alone and go to sleep, and he cursed her and said he was going to whip her. She begged him, and defendant got a rope and threw the end over the joist, but didn't tie it. He had a knife and whip, but didn't attempt to use them in any way." The effect and intention was, clearly, to frighten. This is also shown in Mrs. Daniels' own testimony : "She was greatly terrified and frightened. She reckoned that he did it to scare her, and didn't know any reason to attribute it to except defendant's meanness."

The defense set up in this case was that the acts of defendant were done to control his wife through her fears, and he endeavored to show the jury the reasons why he pursued this course ; but the court would always rule out every particle of evidence tending to show it, and it is in this defendant claims to have been injured by the ruling of the court.

The court will see he had appealed to her love, but she had explained to him and to others that she loved this Dr.

Wright, and couldn't help it.    Even when asked this question before a public court, she does not pretend to deny it, but plead that she did not tell defendant so on the night of the difficulty.

We submit that this mode of controlling a woman is not without a precedent.    That profound student of human nature, Shakespeare, has clearly demonstrated the feasibility of this plan in his matchless play of "Taming of the Shrew;" and, considering that defendant was not only illiterate, but had a far more serious labor to perform than had Petruchio, it is quite pardonable that his treatment should have partaken more of that *argumentatum ad mulierem,* which Blackstone says was always jealously insisted on as a right by the humbler classes.    2 Bl. Com.; *Black* v. *The State,* 1 Wins. N. C. Law, 266.

True, it is in some states regarded as too old-fashioned for this polite age to consider the marital relation as any defense against a battery; but we submit that under every ruling on this question, in any state, it is required that the battery should be of no ordinary character to call into requisition the strong arm of the criminal law to interfere between husband and wife, and perhaps there never was an instance of a husband being tried for simple assault only on his wife.

It is certainly a sound principle of law, enunciated by the supreme court of Mississippi, "that the husband should still be permitted to exercise the right of moderate chastisement in cases of great emergency, and to use restraints in cases of misbehavior, without subjecting himself to vexatious prosecutions resulting in the discredit and shame of all parties concerned." *Bradley* v. *The State,* 1 Walk. 156.    The principle is *à fortiori* in its application to citizens in the humbler walks of life, as in the case at bar.

There was practical sense in the decision of the supreme court of Alabama which declared a husband, when indicted for an assault and battery on his wife, may show in mitiga-

tion that he was provoked thereto by her bad behavior and misconduct. *Robbins* v. *The State*, 20 Ala. 36.

At common law a husband could not be convicted of a battery unless accompanied with cruelty. See *The State* v. *Black*, referred to above.

Is the law different in Texas? Certainly the Penal Code cannot apply in its ordinary acceptation to the marital relation. That very condition demands there should be a great consideration and allowance for human frailties and passions. How inappropriate, then, is the charge of the court that the injury intended may be either bodily pain and constraint, or a sense of shame, or other disagreeable emotion of mind! And how unjust to the defendant in refusing the charge to the jury to look to the intent with which defendant tied his wife's hands; that the law did not look at acts between husband and wife with the same strictness as between persons not so related; and that there should be actual violence and pain to enable the wife to complain of a battery. And, in the light of foregoing authorities, defendant insists that the court erred in ruling out the testimony of Mayo O. Banon and Mrs. Winch, in relation to the misconduct of Mrs. Daniels, and refusing to allow the same to be offered either in justification or mitigation.

Defendant further insists that the court erred in charging the jury that they could find defendant guilty of a simple assault. The court refused to let any evidence go in mitigation or extenuation of the offense, yet charged that the jury could find a simple assault. Defendant insists that, if the court was right in excluding evidence as complained of, it was aggravated assault or nothing, and defendant was entitled to the benefit of a charge to that effect. If the law defines the limits of a crime, the defendant, however blamable his conduct may be, is entitled to an acquittal just so long as he keeps outside of the line of crime as

defined. Here, if the court is correct, an adult male assaults a female, an offense which the law absolutely defines as an aggravated assault. *Hill* v. *The State*, 34 Texas, 624; 31 Texas, 63. And the court certainly charged contrary to this law in saying that it could be a simple assault.

Lastly, we call special attention to the record in this case. The original affidavit was made by the county attorney in person, on alleged information and belief, and on this affidavit he writes and files his information in the county court. We respectfully submit that such practice is unauthorized, and contrary to the policy and spirit of the law of 1876, which requires the county attorney to send for witnesses and take their statements and swear them to it, and then on this statement he must file his information. The object of the law was to prevent the county attorney taking up a citizen whenever he felt like it, or had a belief on the subject, and it is the great constitutional right of a party that there should be true and reasonable grounds sworn to before his person could be seized; and we insist these proceedings are a nullity.

*George McCormick*, Assistant Attorney General, for the State.

White, J. It is unnecessary to comment upon but a single feature presented by the record in this case. The party was tried upon an information for an aggravated assault. The information is based upon the affidavit of N. C. Reed, county attorney of Navarro county, who states that, to "the best of his information and belief, one E. B. Daniels," etc., going on to set out the facts constituting the assault. The information makes no reference to the affidavit, though it appears to have been based upon it.

We are of opinion that the affidavit is not such as is

required by law ; that the county attorney should not have made the affidavit, but should have proceeded, under the provisions of our statute, to have procured the necessary complaint, affidavit, or testimony upon which to base or bring his information.

The following are the rules provided by statute for such proceedings (Acts Fifteenth Legislature, 87, 88) :

"Sec. 13. Upon complaint being made before the county attorney that an offense has been committed which the county court or a justice of the peace has jurisdiction to try, it shall be the duty of said county attorney to reduce the complaint to writing, and cause the same to be signed and sworn to by the complainant, and it shall be duly attested by the county attorney. Said complainant shall state the name of the accused, if his name is known ; and the offense for which he is charged shall be stated in plain and intelligible words, and it must appear that the offense was committed in the county where the complaint was filed ; and the complaint must show, from the date of the offense stated therein, that the offense is not barred by limitation.

"Sec. 14. The complaint specified in section 13 of this act may be made before any judge of the county court, county attorney, or justice of the peace ; and, for the purpose of carrying out the provisions of this act, the county attorney is hereby authorized to administer an oath.

"Sec. 15. It shall be the duty of the county attorney, upon the filing of said complaint, to prepare an information in writing, which shall be in compliance with Article 403 (Pasc. Dig., Art. 2870), part 3, title 4, chapter 3, of the Code of Criminal Procedure.

"Sec. 16. Whenever any credible person shall inform any county attorney that an offense has been committed, and shall give the names of the person or persons who may have knowledge of an offense, it shall be the duty of said

county attorney, and he is hereby authorized and required, to issue a subpœna requiring said persons to appear before him, if the case is within the jurisdiction of the county or district court, at a time and place named in such subpœna, to testify under oath in behalf of the state, without stating in the subpœna the nature of the offense or the party suspected; and for this purpose county attorneys are hereby authorized to administer oaths. If the supposed case is one exclusively within the jurisdiction of a justice of the peace, the subpœna shall be returnable to the justice of the peace in whose precinct the offense was committed; and, if said person or persons shall fail or refuse to obey said subpœna, it shall be the duty of said county attorney, if he has reason to believe that the testimony is material, on his own motion or upon the affidavit of any credible person, to make his application to the justice of the peace, or clerk of the court having jurisdiction of the case, for an attachment to compel the attendance of said witness, to testify before the said county attorney or justice of the peace, as the case may be, at a time and place named in the attachment; *provided* that, if the information given by said credible person be in writing and under oath, the attachment shall issue as an original process, upon the written application of said county attorney; and it shall also be the duty of the county attorney to notify the justice of the peace to whom he sends such witnesses of all the information he has relative to the case; *and provided, further*, in capital cases the subpœna or attachment shall be made returnable to the county judge before whom the examination shall take place.

" Sec. 17. Upon the appearance of said witnesses it shall be the duty of the county attorney, justice of the peace, or county judge, as the case may be, to reduce their testimony to writing and cause the same to be signed by such witnesses; and, if it appear therefrom that an offense has been commit-

ted, the county attorney shall, upon said testimony, file an information in the court having jurisdiction of said offense, as is provided for in section 13 of this act," etc.

The act from which these extracts are taken was approved August 7, 1876, and took effect from its passage. It was in force at the time the affidavit and information in this case was filed. In harmony with these provisions are the provisions of section 8 of an act to organize county courts, and define their powers and jurisdiction. Acts Fifteenth Legislature, 20, and Pasc. Dig., Arts. 2870, 2871.

When tested by these rules, the affidavit in this case is not such an one as is contemplated by the law. Affiant states that the facts are stated " to the best of his information and belief." His information must have been obtained from some one else, and, if he believed the information, the party must have been a credible person in his estimation, and he should have procured his affidavit or testimony as a basis for the information.

Doubtless there are instances in which the county attorney would be authorized to make an affidavit, as, for instance, where he was the sole witness to a violation of the law ; but our construction of the language of the statute above quoted is that he is not authorized to make the affidavit when he derives his knowledge of the facts from another party. As to the relationship which the affidavit or complaint bears to the information, see the case of *Davis* v. *The State*, decided at the present term of this court, *ante*, p. 184.

The affidavit upon which the information in this case is based being insufficient, and unauthorized by law, the judgment of the lower court is reversed and the case is dismissed.

*Dismissed.*